No. 22-13879

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

MATILDE SANTANA,
*Appellant,*

v.

TELEMUNDO NETWORK GROUP, LLC
NBC UNIVERSAL MEDIA, LLC
*Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
Case No. 20-CV-01157-WWB

## APPELLEES' AMENDED RESPONSE BRIEF

Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Marlene Quintana, Esq.
Florida Bar No.: 88358
marlene.quintana@gray-robinson.com
Sacha Dyson, Esq.
Florida Bar No.: 509191
sacha.dyson@gray-robinson.com
Fabian A. Ruiz, Esq.
Florida Bar No.: 117928
fabian.ruiz@gray-robinson.com
Sydney M. Feldman, Esq.
Florida Bar No.: 1017798
sydney.feldman@gray-robinson.com
GrayRobinson, P.A.
333 SE Second Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
*Counsel for Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. Rule 26.1-1, Appellees, Telemundo Network Group, LLC and NBC Universal Media, LLC notify the Court that the following persons and entities have an interest in the outcome of this appeal:

Berger, Wendy W., United States District Judge, Middle District of Florida

Bleau, Denise Joanne, Esq., Counsel for Plaintiff/Appellant

Comcast Corporation, NASDAQ: CMCSA, Parent Corporation of Defendants/Appellees

Dyson, Sacha, Esq., Counsel for Defendants/Appellees

Feldman, Sydney, Esq., Counsel for Defendants/Appellees

Glickman, Jonathan S., Esq., Counsel for Plaintiff/Appellant

GrayRobinson, P.A., Counsel for Defendants/Appellees

Hearing, Gregory Alan, Esq., Counsel for Defendants/Appellees

Hoffman, Leslie R. United States Magistrate Judge, Middle District of Florida

Kidd, Embry J., United States Magistrate Judge, Middle District of Florida

Mann, Jonathan Thomas, Esq., Counsel for Plaintiff/Appellant

Miller, Daniel A., Esq., Counsel for Plaintiff/Appellant

NBC Universal Media, LLC, Defendant/Appellee

Quintana, Marlene, Esq., Counsel for Defendants/Appellees

Rehns, Kenneth Mark, Esq., Counsel for Plaintiff/Appellant

Reiter, Jack, Esq., Counsel for Defendants/Appellees

Ruiz, Fabian A., Esq., Counsel for Defendants/Appellees

Santana, Matilde, Plaintiff/Appellant

Sarofsky, Mahra Colette, Esq., Counsel for Plaintiff/Appellant

Schwartz, Sladkus, Reich Greenberg Atlas, LLP, Counsel for Plaintiff/Appellant

Slusher, Jeremy E., Esq., Counsel for Plaintiff/Appellant

Slusher & Rosenblum, P.A., Counsel for Plaintiff/Appellant

Sullivan, Kevin M., Esq., Counsel for Defendants/Appellees

Taylor English Duma, Counsel for Plaintiff/Appellant

Telemundo Network Group, LLC, Defendant/Appellee

Telemundo of Florida, LLC, subsidiary of Defendant/Appellee

Ward Damon, P.L., Counsel for Plaintiff/Appellant

Waters, F. Ryan, Esq., Counsel for Defendants/Appellees

## CORPORATE DISCLOSURE STATEMENT

Telemundo Network Group, LLC and NBC Universal Media, LLC are indirect subsidiaries of Comcast Corporation. No parent corporation or publicly-held corporation owns 10% or more of Comcast Corporation. The ticker symbol for Comcast Corporation, which is traded on the NASDAQ, is CMCSA.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This appeal is governed by well-settled legal principles, and Appellees do not believe oral argument will aid the Court in its evaluation of these straightforward issues. Thus, Appellees do not request argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................ C-1 of 3

CORPORATE DISCLOSURE STATEMENT ............................................ C-3 of 3

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF THE CASE .......................................................................2

STANDARD OF REVIEW ...........................................................................21

SUMMARY OF ARGUMENT .....................................................................22

ARGUMENT ..............................................................................................25

  I. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S CLAIM
     FOR RETALIATION ........................................................................25

  II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT
      FOR DEFENDANTS BECAUSE THE ALLEGED CONDUCT WAS NOT
      SEVERE OR PERVASIVE ENOUGH TO CONSTITUTE A HOSTILE
      WORK ENVIRONMENT ...................................................................28

    A. Title VII and the FCRA are not "civility code[s]".....................................28

    B. Mr. Soto's alleged conduct was not severe or pervasive, and did not create
       a hostile work environment ......................................................................33

   C.  Plaintiff ignores the cases cited in the district court's order that support summary judgment ........................................................................37

III. THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT BECAUSE THERE IS NO BASIS FOR EMPLOYER LIABILITY ...........40

   A. Because Mr. Soto was not Plaintiff's supervisor, Plaintiff must present evidence that Defendants were negligent with respect to his conduct—but there is no evidence to support such a finding .........................................41

   B. Alternatively, regardless of supervisor status, there is no basis for employer liability under the affirmative defense established by *Faragher* and *Ellerth* ......................................................................................45

IV. THE DISTRICT COURT CORRECTLY DENIED PLAINTIFF'S RULE 59 MOTION TO ALTER OR AMEND JUDGMENT ......................................51

   A. The district court properly denied Plaintiff's attempt to raise new arguments that should have been raised before entry of judgment..........51

   B. The trial court did not commit "manifest error"—or any error at all—when it dismissed Plaintiff's retaliation claim based upon her failure to cure the deficiencies it had previously identified...................................................53

V. PLAINTIFF DOES NOT HAVE DEMONSTRABLE FRONT OR BACK PAY DAMAGES...........................................................................54

CONCLUSION ...................................................................................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7) ...............................57

CERTIFICATE OF SERVICE .................................................................57

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Alvarez v. Royal Atl. Developers, Inc.*,
610 F.3d 1253 (11th Cir. 2010)...........................................................22

*Baldwin v. Blue Cross/Blue Shield of Ala.*,
480 F.3d 1287 (11th Cir. 2007)................................................. passim

*Baskerville v. Culligan International, Co.*,
50 F.3d 428 (7th Cir. 1995)..................................................................30

*Berry v. Delta Airlines, Inc.*,
260 F.3d 803 (7th Cir. 2001)................................................................34

*Brungart v. Bellsouth Telecommunications, Inc.*,
231 F.3d 791 (11th Cir. 2000)..............................................................25

*Burlington Industries, Inc. v. Ellerth*,
524 U.S. 742 (1998) ..................................................................... passim

*Burlington N. & Sante Fe Ry. Co. v. White*,
548 U.S. 53 (2006) ...............................................................................29

*Cush-Crawford v. Adchem Corp.*,
94 F. Supp. 2d 294 (E.D.N.Y. 2000)....................................................55

*Davila v. Delta Air Lines, Inc.*,
326 F.3d 1183 (11th Cir. 2003)............................................................21

*Edwards v. Prime, Inc.*,
602 F.3d 1276 (11th Cir. 2010)............................................................21

*EEOC v. AutoZone, Inc.*,
692 Fed. App'x 280 (6th Cir. 2017)............................................. 42, 43

*Evers v. Gen. Motors Corp.*,
770 F.2d 984 (11th Cir. 1985)..............................................................21

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) ..................................................................... passim

**TABLE OF AUTHORITIES--CONTINUED**

**Cases**                                                                  **Page(s)**

*Farley v. Am. Cast Iron Pipe Co.*,
   115 F.3d 1548 (11th Cir. 1997)..........................................44

*Greene v. Alabama Dep't of Revenue*,
   746 Fed. App'x 929 (11th Cir. 2018)...............................25

*Gupta v. Florida Bd. of Regents*,
   212 F.3d 571 (11th Cir. 2000)...............................29, 31, 39

*Guthrie v. Waffle House, Inc.*,
   460 Fed. App'x 803 (11th Cir. 2012)...........................29, 38

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993) ........................................................29

*Jackson v. Ala. Dep't of Corr.*,
   643 Fed. App'x 889 (11th Cir. 2016)...............................39

*Johnson v. Miami-Dade Cnty.*,
   948 F.3d 1318 (11th Cir. 2020)......................................26

*Latrece Lockett v. Choice Hotels Intern., Inc.*,
   315 Fed. App'x 862 (11th Cir. 2009)..........................29, 38

*Laurent-Workman v. Wormuth*,
   54 F.4th 201 (4th Cir. 2022)..........................................26

*Madray v. Publix Supermarkets, Inc.*,
   208 F.3d 1290 (11th Cir. 2000).....................................47

*Matherne v. Ruba Mgmt.*,
   624 Fed. App'x. 835 (5th Cir. 2015)...............................44

*McCafferty v. Preiss Enters., Inc.*,
   534 Fed.Appx. 726 (10th Cir. 2013) ..............................43

*Mendoza v. Borden*,
   195 F.3d 1238 (11th Cir. 1999).............................29, 30, 35

**Cases**                                                                **Page(s)**

*Michael Linet, Inc. v. Village of Wellington, Fla.*,
   408 F.3d 757 (11th Cir. 2005)................................................................51

*Miller v. Kenworth of Dothan, Inc.*,
   277 F.3d 1269 (11th Cir. 2002)..............................................................50

*Mitchell v. Pope*,
   189 Fed. App'x 911 (11th Cir. 2006)..................................... 29, 37, 38

*Morrow v. Kroger Ltd. P'ship*,
   681 Fed. App'x 377 (5th Cir. 2017).......................................................43

*Olson v. Lowe's Home Ctrs., Inc.*,
   130 Fed. App'x 380 (11th Cir. 2005).....................................................33

*Reeves v. C.H. Robinson Worldwide, Inc.*,
   594 F.3d 798 (11th Cir. 2010)..................................................... passim

*Shannon v. Bellsouth Telecomms, Inc.*,
   292 F.3d 712 (11th Cir. 2002)...............................................................25

*Shepherd v. Comptroller of Public Accounts of Texas*,
   168 F.3d 871 (5th Cir. 1999)................................................................30

*Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co.*,
   508 F.3d 1337 (11th Cir. 2007).................................................... 21, 22

*Shuler v. Garrison*,
   718 Fed. App'x 825 (11th Cir. 2017).....................................................53

*Spencer v. Schmidt Elec. Co.*,
   576 Fed. App'x. 442 (5th Cir. 2014)......................................................42

*Thomas v. Cooper Lighting, Inc.*,
   506 F.3d 1361 (11th Cir. 2007)............................................................25

*Tonkryo v. Sec., Dep't of Veterans Affairs*,
   995 F.3d 828 (11th Cir. 2021)...............................................................36

**Cases**                                                                                           **Page(s)**

*Vance v. Ball State University*,
  570 U.S. 421 (2013) .............................................................. 40, 41, 44

*Velazquez-Perez v. Developers Diversified Realty Corp.*,
  753 F.3d 265 (1st Cir. 2014) ................................................. 42

*Walton v. Johnson & Johnson Servs., Inc.*,
  347 F.3d 347 (11th Cir. 2003) .............................................. 51

*Weyers v. Lear Operations Corp.*,
  359 F.3d 1049 (8th Cir. 2004) .............................................. 44

**Rules**

Fed. R. Civ. P. 56(a) ............................................................. 21

Fed. R. Civ. P. 59 ................................................. 20, 21, 24

# STATEMENT OF THE ISSUES

First, whether the district court properly dismissed Plaintiff's retaliation claim because she failed to allege a causal connection between any protected activity and adverse employment action.

Second, whether the district court properly granted summary judgment for Defendants on Plaintiff's hostile work environment sexual harassment claim because the alleged conduct was not severe or pervasive enough to create a hostile work environment under applicable law. Alternatively, whether the district court properly granted summary judgment based on the absence of evidence to support employer liability because: (1) the alleged harasser was not a "supervisor" under applicable law, and there is no evidence Defendants knew about any alleged misconduct; and (2) Defendants promulgated effective anti-harassment policies, and Plaintiff failed to take advantage of such policies.

Third, whether the district court abused its discretion when it denied Plaintiff's motion for relief from judgment based upon declarations of two additional witnesses where Plaintiff identified no meritorious reason for failing to proffer the new witnesses before the district court granted summary judgment, and where she identified no error in the court's application of the law.

Fourth, whether Plaintiff failed to state a claim for front and back pay when it is undisputed she was unable to work because of injuries in an unrelated accident, and not due to any purported sexual harassment.

## STATEMENT OF THE CASE

Defendant Telemundo Network Group, LLC ("Telemundo") is a broadcasting company and subsidiary of Defendant NBCUniversal Media, LLC ("NBCUniversal"). [DE 80-4, at 35-36 (p.34-35)]. NBCUniversal's parent company is Defendant Comcast Corporation ("Comcast"). [DE 80-4, at 147 (p.146)] (Telemundo, NBCUniversal, and Comcast are referred to collectively as "Defendants").

All employees of NBCUniversal's subsidiaries are governed by an Employee Handbook (the "Handbook"), which contains an anti-harassment policy providing that "[e]ach individual has the right to work in an environment free of unlawful harassment including, but not limited to, sexual harassment." [DE 68-1, at 275]. The Handbook also contains an anti-retaliation policy, stating Defendants "strictly prohibit[] any type of retaliation against an individual who in good faith raises a complaint or concern regarding discrimination or harassment," reports a violation, participates in an investigation under the policy, or files a charge or complaint of discrimination or harassment. [DE 68-1, at 276-77]. The anti-retaliation policy "is

designed to ensure that all employees feel comfortable speaking up when they see or suspect illegal or unethical conduct." [DE 68-1, at 278].

The Handbook directs employees to notify Human Resources, an immediate manager, or another senior manager about perceived violations of the anti-harassment or anti-retaliation policies. [DE 68-1, at 276, 279]. Employees may also make anonymous complaints via toll-free hotlines in English or Spanish, an email address, or online through a webpage. [DE 68-1, at 276-79; DE 80-4, at 145 (p.144)]. "All complaints of unlawful harassment or other violations" are "reviewed promptly and, where appropriate, investigated," and confidentiality is "maintained during the investigation except to the extent disclosure is necessary for the purpose of investigating or taking appropriate action." [DE 68-1, at 276].[1]

## Plaintiff's Employment Before Telemundo

From 2000 through February 2018, Plaintiff worked as a Senior Account Executive at a television station owned by ZGS Communications ("ZGS")—a company unrelated to Defendants—focusing on television advertisement sales. [DE 80-3, at 99-101].

Around 2013 or 2014, ZGS hired Anibal Soto ("Mr. Soto") as a sales manager. [DE 80-3, at 93]. Plaintiff knew Mr. Soto for "[q]uite a few years" before he was

---

[1] The foregoing policies were in effect at all relevant times.

hired, and she reported to him at ZGS for more than four years. [DE 80-3, at 94-95]. While Plaintiff and Mr. Soto were employees at ZGS, around 2014 or 2015, Mr. Soto became "dear" friends with Plaintiff's husband, Dominick Cicale ("Mr. Cicale"). [DE 71, at 36-38 (p.144-51)]. They socialized—"[ate], dr[a]nk, talk[ed], h[u]ng out, discuss[ed] business [and] different ventures"—"pretty frequently," at one time three to four evenings per week. [DE 71, at 37 (p.145)]. Mr. Soto was also invited to Plaintiff and Mr. Cicale's house for family gatherings. [DE 71, at 37-38 (p.146-51)].[2] Plaintiff never complained about discrimination or harassment during her employment at ZGS. [DE 80-3, at 108].

**The Colstar Accident and Lawsuit**

On December 10, 2016, while employed at ZGS, Plaintiff and Mr. Cicale were involved in a bus accident. [DE 80-3, at 27]. They sued Colstar Transportation Services, Inc., (the "Colstar Case") and, in February 2018, Plaintiff filed an amended complaint asserting, among other things, that her working ability was impaired because of the accident (the "Colstar Accident"). [DE 68-1, at 123].

---

[2] Mr. Cicale did not remember what year they became friends but thought it was when Mr. Soto "started working for Telemundo." [DE 71, at 36 (p.144)]. Plaintiff testified they met in 2014 or 2015, while Mr. Soto and Plaintiff were working at ZGS. [DE 80-3, at 95].

**Telemundo's 2018 Acquisition of ZGS's Assets**

In February 2018, the same month Plaintiff filed the amended complaint in the Colstar Case, Telemundo acquired ZGS's assets, hired Plaintiff as a Senior Account Executive, and hired Mr. Soto as a Local Sales Manager in Orlando. [DE 80-3, at 103-04]. Defendants also hired Alejandro Sanchez ("Mr. Sanchez"), Plaintiff and Mr. Soto's former general manager at ZGS, but in May 2018, Mr. Sanchez left and Defendants hired Luis Roldan ("Mr. Roldan") as general manager. [DE 80-2, at 19-20 (p.18-19); DE 73, at 12 (p.42)]. When Telemundo hired Plaintiff, she received a copy of the Handbook, including the anti-discrimination and anti-retaliation policies, and NBCUniversal provided training on those policies either quarterly or every six months. [DE 80-3, at 121-23].

Plaintiff's job duties and responsibilities "pretty much stayed the same" as they were at ZGS. [DE 80-3, at 100, 104]. Account executives like Plaintiff were provided a "budget" (i.e., sales revenue targets) and were evaluated (and received commissions) based, in part, on "[h]ow close" they came to achieving their budget. [DE 80-2, at 25-26, 60-62 (p.24-25, 59-61); DE 80-3, at 100, 110-11]. Although, at the time of the acquisition, Plaintiff maintained the largest book of business of the account executives at the Orlando station, [DE 80-2, at 28, 97 (p.27, 96); DE 31, at 2], Plaintiff testified her ability to service her clients at that time was limited due to her injuries from the Colstar Accident. She could not "get out physically to see

clients face-to-face," and her sales numbers declined in 2018. [DE 80-3, at 114-15, 120; DE 68-1, at 162]. Mr. Roldan testified "her performance was the poorest of the group." [DE 73, at 12 (p.44)].

Mr. Soto's job duties at Telemundo included conducting sales meetings and providing account executives with market information, sales material, and pricing information. [DE 80-2, at 17-18 (p.16-17)]. He recommended budget adjustments or account transfers between account executives, but any changes were only made with "input" from and in "consultation with" the general manager; "sometimes" the general manager accepted his recommendations. [DE 80-2, at 18-21 (p.17-20)]. Mr. Soto and the general manager's compensation were dependent on the overall sales performance of all account executives at the station. [DE 80-3, at 146; DE 80-2, at 99 (p.98)].

### Plaintiff's First Medical Leave – October 30, 2018 to June 25, 2019

Because of her injuries in the Colstar Accident, Plaintiff needed surgery and, on October 24, 2018, applied for short-term disability and leave under the Family and Medical Leave Act ("FMLA"). [DE 80-3, at 125-26]. She received 100% of her compensation for the entirety of her short-term leave, including her base salary and her full commission she would have received if she met 100% of her sales goals. [DE 80-3, at 134].

Mr. Soto was responsible for Plaintiff's accounts while she was on leave. [DE 80-3, at 138-39; DE 80-2, at 99-100 (p.98-99)]. Some of Plaintiff's clients later complained about Mr. Soto's responsiveness or handling of their accounts, [DE 80-2, at 81-94 (p.80-93)], but revenue increased while Mr. Soto managed them; before Plaintiff went on leave, she had reached 43% of her goal for the third quarter of 2018, and while she was on leave and Mr. Soto managed her accounts, she reached 52% of her goal for the fourth quarter of 2018, 79% of her goal for the first quarter of 2019, and 62% of her goal for the second quarter of 2019. [DE 68-1, at 264-65, DE 80-3, at 146-47; DE 80-2, at 97-100 (p.96-99)].

On December 3, 2018, about a month into Plaintiff's first leave, Plaintiff's counsel sent Defendants a letter claiming Mr. Soto "required [Plaintiff] to participate in email and telephone communications, and to process client orders" while on medical leave, in violation of the FMLA. [DE 67-2, at 2-3]. Her counsel also claimed her clients were not being attended to. [DE 67-2, at 2-3]. The letter did not contain any claims of harassment.

On April 11, 2019, four months after the first letter, and more than five months after Plaintiff began her first leave of absence, her counsel sent a demand letter for $4.7 million (the "April Letter"), claiming, for the first time, that Mr. Soto's "treatment" of Plaintiff and "neglect" of Plaintiff's clients was "apparently fueled by discrimination" based on Plaintiff's "rebuff of the sexual advances" made by Mr.

Soto.  [DE 68-1, at 532-34].  The letter also asserted Mr. Soto's behavior was "tacitly condoned by the persistent inappropriate sexual conduct of" Mr. Roldan.  [DE 68-1, at 532].  Plaintiff testified the letter was the first and only time she notified Defendants of the alleged conduct.  [DE 80-3, at 204-05].

## The Investigation and Plaintiff's Allegations

Defendants initiated an investigation upon receiving the April Letter.  The investigation was led by Patti Lewis, the Human Resources Director at The Golf Channel, who was certified by the Society of Human Resources Management and had years of experience.[3]  [DE 80-4, at 12-16 (p.11-15)].

Ms. Lewis interviewed Plaintiff via telephone on April 30, 2019, while Plaintiff was still on medical leave.  [DE 80-4, at 18-21 (p.17-20); DE 69-1, at 4].  Ms. Lewis then interviewed thirteen other witnesses, including Mr. Soto and Mr. Roldan, five members of Plaintiff's sales team (which encompassed "everyone that reported to Mr. Soto"), and several employees in other departments.[4]  [DE 80-4, at

---

[3] Telemundo and The Golf Channel are independent networks, both "under the umbrella of NBCUniversal."  [DE 80-4, at 10 (p.9)].

[4] Ms. Lewis interviewed:
- Plaintiff, Mr. Soto, and Mr. Roldan;
- All five account executives who reported to Mr. Soto: Eduardo Echenique, Ingrid Ramirez, Bianca Diaz, Marisol Otero, and "Marcus" (whose last name she did not provide) [DE 80-4, at 36-37 (p.35-36)];
- Five members of the news department: Heidi Rodriguez (who worked at the "news assignment desk," DE 80-4, at 59 (p.58)); Valeska Gil (a reporter, DE

36-37 (p.35-36)].   Another Human Resources representative, Camille Castillo, participated in all interviews except Plaintiff's.  [DE 80-4, at 97 (p.96)].

Several employees explained there was a culture of embracing, hugging, or showing affection at work because, as Ms. Lewis understood it, the Latin culture is "very family oriented and people give each other hugs of congratulations, et cetera." [DE 80-4, at 66 (p.65)].

Ms. Lewis's interview notes reflect that Plaintiff claimed Mr. Soto had touched her on two occasions: (1) he put his arms around her neck and shoulders and "started massaging," and (2) while Plaintiff and Mr. Soto were driving to Miami for a client, he "squeezed [her] inner thigh" and then "grabbed" Plaintiff's cell phone. [DE 69-1, at 4].  Both incidents occurred before Plaintiff or Mr. Soto were employed by Telemundo, and Plaintiff did not report either alleged incident to ZGS before, or Telemundo after, the acquisition.  [DE 80-3, at 175-83].

Plaintiff also claimed Mr. Soto made inappropriate comments directed to her and others in the office.  For example, she alleged Mr. Soto commented about her "breasts and rear," her shirts and whether they revealed enough, her hair, and her lipstick.  [DE 80-1, at 2-4; 80-3, at 189-91].  She also alleged he once told a story

---

80-4, at 114-15 (p.113-14)); Andrea Marcial (an anchor, DE 80-4 at 116 (p.115); DE 69-1, at 7); Jessica Pacheco (an assistant news director, DE 80-4, at 121 (p.120); DE 69-1, at 45); and Ana Karina (a director of creative services, DE 69-1, at 7); and

- The Human Resources Manager, Leslie Sierra [DE 80-4, at 124 (p.123)].

about wanting to have sexual relations with his teacher as a teenager, [DE 80-1, at 5], once pantomimed removing hair from his pubic region and placing it on his head while "in the middle of the sales area," [DE 80-3, at 183-86], and once asked her to enter his office by stating, "can you come in, or do I need to 'cum' in you." [DE 80-1, at 6]. Additionally, she claimed he used double-entendres like "market penetration" during sales meetings where both male and female employees were present. [DE 80-3, at 188-91]. When she was on her first medical leave, she claimed Mr. Soto told her during a call to "go to the bed and spread your legs like you know how," and he texted her on another occasion, stating one of her clients, Diahann, reminded him of a diaphragm. [DE 80-3, at 219-20; DE 80-1, at 6-7]. These comments purportedly occurred before or during her medical leave but none were referenced in the April Letter.

Plaintiff claimed that, although Mr. Soto began making suggestive comments to her in 2014 while they worked together at ZGS, the frequency of those comments "slowed" after Mr. Soto met her husband (before she began working at Telemundo). [DE 80-1, at 3]. She claimed he nonetheless made "such comments about others" in her presence. [DE 80-1, at 3]. Several other employees interviewed by Ms. Lewis confirmed "jokes were part of the culture in the work environment" and some "might be borderline inappropriate, depending on the context." [DE 80-4, at 73, 103-09 (p.72, 102-08)]. One account executive, Bianca Diaz, indicated "sometimes things

are said" that "may not be appropriate for work," and she thought it "might be because of Hispanic culture." [DE 80-4, at 111-12 (p.110-11)].

Plaintiff claimed during her interview that, while she was on leave, Mr. Soto neglected her clients and insisted she work. [DE 69-1, at 7]. In his interview with Ms. Lewis, Mr. Soto admitted he contacted Plaintiff at the beginning of her leave "to get information," but claimed he stopped after Plaintiff's counsel sent the first letter. [DE 80-4, at 70 (p.69)]. Additionally, Plaintiff admitted she "probably" told clients she would be available the week after her surgery and they should follow up with her. [DE 80-3, at 144]. When Ms. Lewis asked Mr. Soto about his treatment of Plaintiff's clients, he "indicated that he communicated with" them "throughout" her leave. [DE 80-4, at 84 (p.83)]. Ms. Lewis found his answers to be credible; because he was one of the last people she interviewed, and based on everything she learned until that point, she did not feel the need to review backup documentation relating to his servicing of the accounts. [DE 80-4, at 83-85 (p.82-84)].

Plaintiff also claimed during her interview that two customer accounts "were taken from her due to declining sexual favors," but Ms. Lewis confirmed the decisions to transfer those two accounts "weren't made by Mr. Soto. One was directed by the client and the other was directed by the prior GM." [DE 80-4, at 25, 94 (p.24, 93)].

With respect to Mr. Roldan, some employees believed he showed "favoritism" or there was a "clique" with those "he worked closest with." [DE 80-4, at 58, 134 (p.57, 133)]. Plaintiff testified he once introduced another woman in the office as "the most beautiful and sexy woman of the station," but Plaintiff did not know whether the woman objected to that comment. [DE 80-3, at 200]. Plaintiff also contended Mr. Roldan made one inappropriate comment directed at her: he asked Mr. Soto in Spanish, "is your friend here?" purportedly referring to Plaintiff, and Mr. Soto responded, "yes, she's still here." [DE 80-3, at 202]. Plaintiff later clarified she did not believe that remark was sexually inappropriate. [DE 80-3, at 202].

Plaintiff also claims there was a "rumor" that Mr. Roldan and Heidi Rodriguez, an employee in another department, were in a relationship [DE 80-4, at 118 (p.117)]. One employee saw Mr. Roldan and Ms. Rodriguez "rubbing hands" at a work event. [DE 80-4, at 132-33 (p.131-32)]. When Ms. Lewis questioned Mr. Roldan and Ms. Rodriguez about it, however, both denied being in a relationship. [DE 80-4, at 64, 117-18 (p.63, 116-17); DE 69-1, at 12-13]. Based on the interviews, Ms. Lewis concluded Mr. Roldan and Ms. Rodriguez merely "went to a lot" of "work-related events together" but there was no "inappropriate" conduct. [DE 80-4, at 119-20 (p.118-19)].

At the conclusion of her investigation, Ms. Lewis believed both Plaintiff and Mr. Soto each "had their versions of what took place," but she could not substantiate Plaintiff's claims. [DE 80-4, at 83 (p.82)]. She concluded "there had not been any form of sexual harassment or inappropriate touching." [DE 80-4, at 137 (p.136)]. However, she also noted "there was a little bit of looseness in the workplace in regard to jokes," so she felt "there was opportunity for more respect-in-the-workplace training and maybe a different position for Mr. Soto." [DE 80-4, at 137-38 (p.136-37)].

**Plaintiff's Return to Work and Second Medical Leave – June 25, 2019 through November 12, 2019**

Plaintiff returned to work from her first medical leave on June 25, 2019.[5] [DE 80-3, at 118]. Just over a month later, in August 2019, Mr. Soto was transferred to another role so Plaintiff no longer reported to him. [DE 80-3, at 148; DE 80-2, at 16-18 (p.15-17)]. Plaintiff acknowledged Mr. Soto did not take any disciplinary action against her between her return to work and his transfer. [DE 80-3, at 148].

After she returned, Plaintiff asserted Mr. Soto "made [her] feel uncomfortable" because "every time" she wrote him an e-mail, he requested her "to

---

[5] On May 5, 2019, Plaintiff's physician executed a form indicating that, from April 30, 2019 to June 7, 2019, Plaintiff could "work from home full time." [DE 68-1, at 465]. Plaintiff was not authorized to work from home full time and remained on short-term disability leave until June 25.

speak to him in his office" instead of responding by email, and he spoke to her in a low voice so she had to move closer to hear. [DE 80-3, at 213]. Mr. Soto did not make any inappropriate comments during those conversations in his office. [DE 80-3, at 213]. Additionally, Plaintiff knew Mr. Soto asked other sales representatives to speak to him in his office, as well. [DE 80-3, at 213].

On one occasion after she returned, Mr. Soto "reached over [Plaintiff's] chair" to grab a pen on her desk, and, in the process, "pulled [her] skirt up with his leg." [DE 80-3, at 181]. But Plaintiff was not sure whether that was intentional, [DE 80-3, at 181-82]. and Mr. Soto averred it was not. [DE 72, at 1].

In November 2019, about four months after she returned to work, Plaintiff required another medical leave of absence because of a second surgery related to the Colstar Accident. The last day she performed work for Telemundo or accessed her company-issued cell phone or laptop was November 12, 2019, and her surgery was scheduled for the following day. [DE 80-3, at 153-54].

Plaintiff exhausted her short-term disability benefits on November 25, 2019, so she applied for long-term benefits. [DE 80-3, at 157]. In that application, she certified under penalties of perjury that, on November 1, 2019, she "believe[d] her condition(s) became severe enough to keep [her] from working," and, as of the date of the application (July 31, 2020), she was "still unable to work because of [her] illnesses, injuries, or conditions." [DE 68-1, at 488, 491-92].

**The Initial Complaint, Motion to Dismiss, and Order**

Plaintiff sued Defendants on June 30, 2020 for hostile work environment sexual harassment and retaliation, under Title VII and the Florida Civil Rights Act ("FCRA"). [DE 1]. Defendants moved to dismiss Plaintiffs' claims and, with respect to her retaliation claim, argued she did not allege a causal connection between the alleged protected activities and any adverse employment action taken against her. [DE 19]. Plaintiff filed a response in opposition. [DE 20].

On February 22, 2021, the district court granted Defendants' Motion and dismissed the retaliation claim without prejudice. [DE 29]. It found that, although plaintiff "allege[d] that the adverse actions took place in close proximity to the time when Defendants became aware of her discrimination complaints . . . the allegations [we]re conclusory and lack[ed] factual support elsewhere in the Complaint." [DE 29, at 7]. Specifically, the court explained, "Plaintiff has not alleged that the relevant decision-makers were aware of her protected activity" and she "failed to allege sufficient facts regarding temporal proximity." [DE 29, at 7].

**The Amended Complaint**

Plaintiff filed an Amended Complaint on March 1, 2021. [DE 31]. She alleged, under "General Allegations," that "[s]ometime in early 2018," "Mr. Soto re-assigned several of Ms. Santana's accounts, including one of her largest accounts, to other account executives and against the client's wishes." [DE 31, at 7]. She also

alleged that, prior to her return from medical leave, she requested to work from home, which she claimed was a "reasonable accommodation," but, Plaintiff alleged, "Defendants denied [her] request." [DE 31, at 10]. And, she alleged, "upon her return," her "superiors instructed other employees to limit interactions with her," and "it took Defendants six weeks to get [her] a new access card" after her previous one went missing. [DE 31, at 10-11]. Finally, she alleged, "Defendants made several last-minute adjustments to [her] performance statistics to reduce her productivity to 79%." [DE 31, at 11].

Within the Counts specific to her retaliation claim, Plaintiff alleged there was a causal link between her protected activities and the allegedly adverse employment actions because "Defendants were aware of the protected activity at the time they took an adverse employment action, which took place shortly after learning of the protected activity, attempting to punish or otherwise discourage Ms. Santana and others from engaging in such activity."[6] [DE 31, at 13-16].

On March 25, 2021, Defendants filed a motion to dismiss the amended complaint, arguing that, although the district court "specifically identif[ied] the deficiencies in her Complaint, Plaintiff still fail[ed] to plead facts sufficient to state a plausible claim for retaliation" because she used the term, "'Defendants,' which

---

[6] The allegations in Count II (Retaliation in violation of Title VII) and Count IV (Retaliation in violation of the FCRA) are identical. [DE 31, at 13-16].

refs to three different companies," without identifying specific individuals or how those individuals would have knowledge of the protected activity. [DE 35, at 1, 8].

Plaintiff never responded to the motion to dismiss her Amended Complaint and, on August 5, 2021, more than four months after Defendants filed the motion, the district court granted it. [DE 40]. The district court found Plaintiff "again failed to provide anything more than conclusory allegations regarding a causal connection" because she failed to identify:

> [W]hen she requested a reasonable accommodation, from whom, and if that person had knowledge of her protected activity; . . . who was responsible for delaying her return to work or when the requests for documentation were made; . . . who made negative comments regarding her dedication to her job, what knowledge that individual had regarding her protected activities, or when such comments were made; . . . what superiors instructed other employees to treat her poorly or what knowledge those persons had; what knowledge regarding her protected activity Roldan had or when his purported conduct took place; who was responsible for replacing Plaintiff's access card and what knowledge regarding her protected activity that individual possessed; and finally, who was responsible for adjusting Plaintiff's performance statistics, when that action was taken, or what that person or persons knew regarding her protected activity.

[DE 40, at 4-5]. The Court also found the "majority of the allegedly adverse actions" occurred after Plaintiff returned to work from leave—which was "two months after she made her complaint of discrimination and participated in the internal investigation," and "[c]ourts have found similar time gaps insufficient to infer a causal connection based on temporal proximity alone." [DE 40, at 5].

17

The Court dismissed the retaliation claim with prejudice because, as it explained, Plaintiff never "moved for leave to amend, requested such leave from [the court], or even responded to the Motion to Dismiss." [DE 40, at 6]. The day after the Court entered the dismissal order, Plaintiff filed a Motion for Relief from the Court's Order, [DE 41], to which Defendants responded [DE 42], and the district court denied [DE 54].[7]

**Defendants' Motion for Summary Judgment**

On November 8, 2021, Defendants moved for summary judgment on Plaintiff's remaining discrimination claim and filed an index to documents in support of its motion for summary judgment. [DEs 67-74]. Defendants argued Plaintiff could not establish a hostile work environment because: (1) the conduct she claimed had occurred during the relevant timeframe was not "severe or pervasive" and, in any event, there was no basis for employer liability because (2) Mr. Soto was not her supervisor; and (3) Defendants promulgated effective anti-harassment policies but Plaintiff failed to use them. *See* [DE 67, at 1-4].

Plaintiff responded on November 30, 2021, relying substantially on her own affidavit executed a day earlier. [DE 80]. In Reply, Defendants requested the district court to strike Plaintiff's affidavit as a sham because "it flatly contradict[ed]" her

---

[7] Plaintiff does not appeal the district court's order [DE 54] denying her relief from the order dismissing her retaliation claim [DE 40].

deposition testimony. [DE 83, at 3]. The district court found that some, but not all, of the affidavit "directly contradict[ed]" her deposition and refused to consider the contradicted portions. [DE 172, at 3]. The district court also found that "[t]he majority" of Mr. Soto's alleged conduct occurred before February 2018 but, because Mr. Soto was not employed by Defendants then, and because the court found Plaintiff had not "presented any evidence to suggest that Defendants were put on notice of Soto's behavior prior to hiring him," it declined to consider "any conduct that occurred prior to February 2018." [DE 172, at 2].

The court granted summary judgment. In a twenty-two page order, it found neither Mr. Soto's nor Mr. Roldan's conduct was severe or pervasive under the governing law; Mr. Soto was not Plaintiff's supervisor; and Defendants had an adequate anti-harassment reporting policy in place, which Plaintiff unreasonably failed to use. [DE 172].

**<u>Plaintiff's Motion to Alter Judgment or Amend Judgment</u>**

On July 29, 2022, Plaintiff filed a Motion to Alter or Amend Judgment under Federal Rule of Civil Procedure 59. [DE 177]. She attached the declarations of two new witnesses—Eduardo Echinique and Trevor Frohne—who, Plaintiff claimed, were "additional former employees of Defendants [who had] . . . come forward with information that further shows how severe and pervasive the sexual harassment was." [DE 177, at 10]. Plaintiff claimed the witnesses were "unavailable" until they

were served with trial subpoenas because they "were previously subject to agreements containing confidentiality provisions and non-disparagement clauses." [DE 177, at 10]. She claimed she did not depose them because she only "sought the deposition of adverse witnesses during the discovery period." [DE 177, at 10]. She requested the court to consider the declarations and grant relief from judgment.

After Defendants filed a response, [DE 180], the court denied the motion. [DE 181]. It found Plaintiff sought "to relitigate matters already decided and to assert or expound upon arguments that could and should have been raised in the first instance." Additionally, it found the declarations "could have been discovered prior to entry of summary judgment." [DE 181, at 1-2]. This appeal follows.

# STANDARD OF REVIEW

This Court reviews *de novo* an order dismissing a case for failure to state a claim, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). But that maxim does not apply to "labels and legal conclusions." *Id.* "Conclusory allegations, unwarranted factual deductions, or legal conclusions masquerading as facts" do not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

This court also reviews *de novo* an order granting summary judgment. Summary judgment is appropriate when the moving party demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the court should review the facts and make inferences in favor of the nonmoving party, once the moving party meets its burden, the nonmoving party may not rely solely on "conclusory allegations without specific supporting facts" to defeat summary judgment. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

This Court reviews an order denying a Rule 59 motion for an abuse of discretion. *Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 508 F.3d 1337 (11th Cir. 2007). "The only grounds for granting a Rule 59 motion are newly-discovered

evidence or manifest errors of law or fact." *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010).

## SUMMARY OF ARGUMENT

Plaintiff mischaracterizes both the facts and the procedural history of this case. Although she challenges the district court's dismissal of her retaliation claim, she omits the fact that she never even filed a response to Defendants' motion to dismiss her retaliation claim. Notwithstanding that procedural deficiency, the district court expressly considered the merits of Defendants' motion. It determined that, despite its prior order dismissing Plaintiff's claim without prejudice and identifying the deficiencies in her allegations, Plaintiff made few substantive changes between the initial and amended complaints. It thus concluded that Plaintiff failed to state a claim. This Court should affirm the dismissal.

The Court should also affirm summary judgment on the discrimination claim.[8] Plaintiff's Statement of Facts makes conclusory assertions and refers to her own affidavit without confronting the fact that, as the district court found, parts of it are blatantly contradicted by her earlier deposition testimony. Without even referencing

---

[8] Plaintiff alleged discrimination under Title VII and the FCRA. The FCRA is modeled after Title VII and, therefore, claims is analyzed under the same analytical framework. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010). The parties and the district court analyzed the statutes together below, Plaintiff analyzes them together in her Initial Brief, and Defendants will similarly address both together within this Brief.

that finding or attempting to explain the discrepancies, she cites her own affidavit, [DE 80-1], 43 times within her Initial Brief and cites her deposition, [DE 80-3], only five times.

Plaintiff also omits when the purported actions occurred. Most of her Brief is based upon conduct that allegedly occurred before Defendants employed either Plaintiff or Mr. Soto. As the district court correctly found, such assertions are immaterial. Even when viewing the record in the light most favorable to Plaintiff, the evidence establishes that, during the relevant timeframe, Mr. Soto made various comments directed at Plaintiff and others in the office, which were, at worst, isolated, albeit inappropriate, jokes; Mr. Soto touched Plaintiff once—unintentionally; and Mr. Roldan commented on other women's appearances and flirted with them. While these actions may be inappropriate or offensive, they do not constitute the type of severe or pervasive conduct that alters the terms and conditions of employment or creates a hostile work environment under settled law. Notably, all of the conduct during the relevant timeframe purportedly occurred *after* Mr. Soto became friends with Mr. Cicale and *after* Mr. Soto was invited to Plaintiff's home for family gatherings.

Moreover, nothing in the record supports Defendants' liability for that alleged conduct. Mr. Soto was not a supervisor under the Supreme Court's definition of that role, so Plaintiff was required to provide evidence that Defendants were negligent

and either knew or should have known about his purported harassment—which she cannot do because she never reported it. Additionally, the evidence establishes that Defendants cannot be liable pursuant to the *Faragher/Ellerth*[9] affirmative defense because they promulgated an effective anti-harassment policy, Plaintiff unreasonably failed to utilize that policy, and, even when she belatedly reported the alleged misconduct through her lawyer, Defendants conducted a thorough, reasonable investigation.

Third, the district court did not abuse its discretion in denying Plaintiffs' Rule 59 Motion for Relief from Judgment because Plaintiff failed to establish the witnesses were unavailable or the district court committed any error, much less manifest error.

Finally, the district court never analyzed whether Plaintiff could recover front and back pay, and this Court need not reach the issue of damages because Plaintiff's liability claims were adjudicated on the merits in Defendants' favor. If the Court considers Plaintiff's argument relating to front and back pay, however, it should find Plaintiff failed to state a claim because there was no evidence of any connection between Plaintiff's inability to work and her sexual harassment claim. This Court should affirm.

---

[9] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S CLAIM FOR RETALIATION

As Plaintiff acknowledges, a claim for retaliation requires a showing that the plaintiff engaged in protected activity, suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action. *Greene v. Alabama Dep't of Revenue*, 746 Fed. App'x 929, 931 (11th Cir. 2018) (citing *Shannon v. Bellsouth Telecomms, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002)). "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Id.* at 932; *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000) (plaintiff must show decision-maker knew about the protected activity when it took an adverse action).

Although a "causal connection may be inferred when there is a close temporal proximity between the protected activity and the adverse action," "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) and affirming dismissal where eight months elapsed between protected activity and allegedly adverse action, and plaintiff provided only "naked assertions" without "particulars about how or when decision-makers . . . supposedly learned of his protected activities").

The district court did not, as Plaintiff argues, require a heightened pleading standard.  In arguing that it was sufficient for her to allege Mr. Soto and Mr. Roldan were her superiors and they were "aware of the investigation after she made Telemundo and NBC Universal aware" of the alleged misconduct, IB at 23, Plaintiff misses the crux of the district court's ruling because those allegations say nothing about the *causal connection* to any alleged adverse employment actions.

Plaintiff argues her allegations were sufficiently specific because she "alleged that the adjustment of her performance statistics to reduce her compensation came about following her reporting."  IB at 23.  But that actually supports the propriety of dismissal.  That statement does not properly allege temporal proximity because Plaintiff fails to specify when her performance statistics or compensation were reduced.  Even if she had included that information, though, that would have also been insufficient because Plaintiff "reported" her complaint to Defendants in April 2019 via a letter from counsel, and she returned to work in June 2019—roughly two months later—so the shortest possible temporal proximity between her reporting and the reduction in her statistics is two months, which this Court and others have consistently held to be insufficient, without more.  *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1328 (11th Cir. 2020); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022).

Thus, to support a causal connection, Plaintiff was required to allege more: for example, which "Defendants" adjusted her statistics, whether the responsible individual knew about her reporting, when the responsible individual learned about her reporting, or the extent of that individual's knowledge. To be clear, the district court did not find—and Defendants do not suggest—that *all* of this detail was required in every instance. But at least *some* detail was required to support an inference that the adverse action was causally connected to the protected activity, rather than taken for some other reason. The district court had already outlined these deficiencies in its first dismissal order but, despite being given a second opportunity, Plaintiff failed to correct them. Indeed, most of Plaintiff's allegations suffer the same lack of detail. [*See* DE 31] ("Defendants denied [her] request for a reasonable accommodation" to work from home); ("Defendants" "unnecessarily delayed" her return to work); (undefined "superiors" instructed other employees to limit interactions with her); (it took "Defendants" six weeks to get [her] a new access card"); ("Defendants," "through" her unspecified "superiors," instructed employees "to limit their interactions with her"); ("Defendants made several last-minute adjustments" to her performance statistics). Thus, the district court correctly dismissed her retaliation claim.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT FOR DEFENDANTS BECAUSE THE ALLEGED CONDUCT WAS NOT SEVERE OR PERVASIVE ENOUGH TO CONSTITUTE A HOSTILE WORK ENVIRONMENT

### A. Title VII and the FCRA are not "civility code[s]"

Title VII and the FCRA "prohibit[] sex-based discrimination that alters the terms and conditions of employment." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007). This can be "brought about in either of two ways": "through a tangible employment action, such as a pay decrease, demotion, or termination"; or "through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." *Id.* Only the second type of prohibited conduct—a hostile work environment—is alleged here.[10]

But "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010).

---

[10] In response to Defendants' Motion for Summary Judgment, Plaintiff claimed she was not suing "only due to the hostile environment," but "also Defendants' tangible employment action" in the form of alleged reassigned benefits, refusing to adjust her budget, neglecting her clients, and denying her request to work from home. [DE 80, at 12]. But, as the district court correctly found, Plaintiff's Amended Complaint alleged only a hostile work environment claim—so it disregarded any assertion that she suffered a tangible employment action. [DE 172, at 12]. Plaintiff does not challenge that ruling on appeal.

"[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," do not run afoul of Title VII or the FCRA. *Faragher*, 524 U.S. at 788. Indeed, this Court has held even conduct that is "crass and juvenile," *Mitchell v. Pope*, 189 Fed. App'x 911, 913 (11th Cir. 2006), "offensive," *see Latrece Lockett v. Choice Hotels Intern., Inc.*, 315 Fed. App'x 862, 866 (11th Cir. 2009), "boorish, rude, unwelcome, and insensitive," *Guthrie v. Waffle House, Inc.*, 460 Fed. App'x 803, 808 (11th Cir. 2012), or "bothersome and uncomfortable," *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000),[11] does not, alone, transform a work environment into a hostile one. Rather, the plaintiff must show the environment is "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To establish a Title VII violation, Plaintiff had the burden of presenting a genuine issue of material fact to support a finding – or at least a reasonable inference – that Plaintiff "subjectively perceive[d]" the work environment as hostile, and her subjective perception was "objectively reasonable." *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999). In evaluating whether conduct is sufficiently severe or pervasive to constitute discrimination, courts generally examine four factors: its

---

[11] *Gupta* was overruled on other grounds, *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

frequency; severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*

Although each inquiry is case- and fact-specific, this Court's analysis of other hostile work environment claims illustrates that the conduct in this case is a far cry from the type of conduct that is actionable under Title VII and the FCRA. For example, in *Mendoza*, this Court affirmed summary judgment for the employer where the plaintiff alleged her supervisor stated he was "getting fired up"; "rubbed his hip against [her] hip while touching her shoulder and smiling; twice "made a sniffing sound while looking at [her] groin area" and once made a "sniffing" sound "without looking at her groin"; and "constant[ly]" followed her around and "star[ed]" at her "in a 'very obvious fashion.'" *Id.* at 1247.

This Court found those allegations were "far below" the "baseline of actionable conduct" established by other circuits and explained that holding such conduct constituted actionable sexual harassment "would trivialize true instances of sexual harassment." *Id.* at 1251-52 n.10 (citing, *Baskerville v. Culligan International, Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (no hostile working environment where harasser made "diminutive references to the plaintiff as a 'pretty girl' and a 'tilly,'" and where there was "one particularly obscene instance in which the alleged harasser simulated the act of masturbation"); *and Shepherd v. Comptroller of Public*

*Accounts of Texas*, 168 F.3d 871, 872 (5th Cir. 1999) (no hostile work environment even where "plaintiff produced evidence of several fairly serious instances of harassment including": the statement "your elbows are the same color as your nipples"; the statement "you have big thighs"; attempts to look down the plaintiff's clothing; and multiple instances of touching)).

Similarly, in *Gupta*, over six or seven months, the plaintiff's supervisor "frequent[ly]" called her home at 9:30 or 10:00 at night and asked about her boyfriend; during some of the calls, asked if she was in bed; once stared at her legs when she wore a skirt; once told her she was beautiful; put his hand on her right thigh; lifted the hem of her dress about four inches; told her "Caribbean and Western people are really promiscuous," but he could "look at [her]" and could tell she was "innocent" and "d[oes]n't have much experience"; stated he "considered men superior to women, that women are like meat, and that 'men need variety in women'"; touched her bracelet; touched a ring she was wearing; and stated after a "dark and stormy night," that he "would have come and spen[t] the night with" her. 212 F.3d at 579-85. This Court held the foregoing conduct was not frequent, physically threatening, or humiliating so as to constitute actionable conduct.

In stark contrast, in *Reeves*, 594 F.3d at 803-05, the plaintiff was a sales representative and the only woman working on the sales floor, with six male coworkers. The plaintiff "had previously worked on a container ship and in the

Merchant Marines, and was no stranger to . . . coarse language," but she testified that the language her coworkers used "was unusually offensive, even compared to the curse words she heard in the Merchant Marines." *Id.* at 803-04. This language was "incessant and vulgar" and, while sometimes "not gender-specific," there was also "a substantial corpus of gender-derogatory language addressed specifically to women as a group in the workplace." *Id.* at 804.

In addition to the offensive language, "[n]early every day," the plaintiff's coworkers tuned the office in "to a crude morning show" which "featured" "graphic discussion[s]," including discussions about women's anatomy. *Id.* One of the plaintiff's coworkers once displayed a pornographic image of a fully naked woman on his computer screen. The plaintiff "frequently" objected to the crude language and conduct and changed the radio station (sometimes twice per day). *Id.* She also complained to her supervisor "on at least five separate occasions," but he did not address the problems and, on the contrary, when plaintiff tried to "turn down the offensive radio station," he asked her to "turn it back up a notch" so he could listen to it. *Id.* at 805. On another occasion, when she brought her own radio to "drown out" the offensive station, her supervisor emailed her "to ask her to stop playing her radio." *Id.* at 806. The plaintiff also complained to two executives, but "nothing ever changed," so she eventually resigned. *Id.* This Court held the evidence supported a finding that "the abuse did not amount to simple teasing, offhand

comments, or isolated incidents," but rather, the workplace was "indiscriminately vulgar, profane, and sexual," and a jury could return a verdict for the plaintiff. *Id.* at 813.

And in *Olson v. Lowe's Home Ctrs., Inc.*, 130 Fed. App'x 380, 388 (11th Cir. 2005), this Court found that conduct was sufficiently severe and pervasive when a supervisor "rubbed his entire body (not merely a hand or hip) against the plaintiff," and on another occasion, grabbed her arm, "pulled her towards him, grabbed her head, pulled it down towards him, and kissed" her, resulting in physical and psychological injuries (including a cervical sprain, facial pain, tension headache, anxiety, and depression).

### B. Mr. Soto's alleged conduct was not severe or pervasive, and did not create a hostile work environment

Plaintiff does not challenge the district court's finding that the relevant timeframe for examining workplace conduct is after February 1, 2018. But in her Initial Brief, Plaintiff omits the crucial factor regarding *when* certain events purportedly occurred and muddies the timeline, thus presenting this Court with evidence outside the relevant period—that is, conduct that allegedly occurred long before Telemundo employed Plaintiff or Mr. Soto. Although Defendants maintain the conduct here simply does not support Plaintiff's cause of action, the timing is significant because conduct before February 1, 2018 involved an entirely different employer. Plaintiff blurred this distinction throughout her Initial Brief.

Indeed, viewed in the light most favorable to Plaintiff, the relevant evidence establishes that during the pertinent timeframe, at most, (1) Mr. Soto made various comments directed at Plaintiff and others in the office, which were either offensive or ill-conceived jokes; (2) Mr. Soto touched Plaintiff once—unintentionally; and (3) Mr. Roldan commented on other women's appearances and flirted with them.[12] Considering the four factors identified in *Mendoza*,[13] the conduct alleged here is much like that described in *Mendoza* and *Gupta* and nothing like *Reeves*, *supra*.

**Frequency**: Despite the claims throughout Plaintiff's Brief that Mr. Soto's comments directed at her and others were "often" and occurred "on a near daily basis," IB at 6, 18, as the district court correctly noted, Plaintiff did not specify when many of those alleged comments occurred. [*See* DE 172, at 5, 14]. Moreover, as

---

[12] The district court properly disregarded "post-complaint incidents" because Plaintiff asserted they were motivated by retaliation rather than sex. [DE 172, at 16]; *see Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 809 (7th Cir. 2001) (finding post-complaint incidents of harassment, "while unfortunate, [we]re not actionable as sexual harassment" because all were allegedly "meant as retaliation" and "were not motivated by any anti-female animus"). But even if this Court considers that conduct—i.e., that Mr. Soto called Plaintiff into his office rather than responding by email, but never said anything inappropriate; "spoke in a low voice" so Plaintiff would get closer to him; and stood close to Plaintiff to brush up against her, *see* [DE 80-1, at 8-9]—it does not support a claim for discrimination for the same reasons that the other alleged conduct is not severe or pervasive under well-settled law.

[13] Defendants address the second and third factors—relating to severity, humiliation, and whether the conduct presented a physical threat—together.

34

the district court found, Plaintiff admitted the comments Mr. Soto had directed at her "slowed" when he became friends with her husband—which was *before* both Plaintiff and Mr. Soto worked at Telemundo and thus outside the relevant timeframe. [DE 80-1, at 2].[14]

And the undisputed evidence establishes that the alleged physical contact was infrequent, unintentional, and objectively unoffensive. Contrary to the unsupported assertions throughout her Brief, which cite her Affidavit as establishing "repeated physical contact," *see* IB at 29, that is clearly inconsistent with her deposition testimony and does not create a disputed issue of fact: Plaintiff **testified** that Mr. Soto touched her only three times over five years—and only once during their employment at Telemundo. *See* [DE 80-3, at 177-83 (identifying three instances of touching and, when asked when there are any other instances, responding, "no")].[15] Plaintiff was not even sure whether that one time was intentional, and Mr. Soto

_____

[14] Even if Mr. Soto's comments during the relevant timeframe were frequent, that does not create a disputed issue of fact because as discussed below, the conduct was not severe, threatening, or humiliating, and did not interfere with Plaintiff's job. *See Mendoza*, 195 F.3d at 1248 (finding "[t]hree of the four factors" "clearly absent"; frequency of the conduct "for the most part lacking"; and, even "to the extent Mendoza showed frequent conduct, the frequency of it does not compensate for the absence of the other factors").

[15] Notably, the purported conduct occurred, at the latest, in November 2019 before Plaintiff went on leave. Plaintiff was deposed years later, on September 22, 2021. Nonetheless, she never attempted to address the discrepancies and, although she filed an Errata Sheet, [DE 83-1], she did not identify her testimony regarding physical contact as needing clarification or correction.

averred it was not. [DE 80-3, at 181-82; DE 72, at 1]. Similarly, as the district court found, "Plaintiff does not assert that [Mr. Roldan] ever made an inappropriate comment directly to her and only identifies a few comments directed to others." [DE 172, at 14]. Thus, Plaintiff failed to establish the alleged conduct was sufficiently frequent to support a finding of a hostile work environment.

**<u>Severity, Physically Threatening, or Humiliating</u>**: Plaintiff never asserted that any of the alleged conduct was physically threatening, and, beyond conclusory assertions that it was "severe" or that she "felt humiliated," IB at 15, 18, 29-30, she identifies no evidence to support a conclusion that these factors are met. At worst, the majority of both Mr. Soto's and Mr. Roldan's alleged comments were ill-conceived jokes or offensive utterances, many of which were not even directed at Plaintiff; in fact, Plaintiff admits they were "couched as 'jokes.'" IB at 28; *cf. Tonkryo v. Sec., Dep't of Veterans Affairs*, 995 F.3d 828, 839 (11th Cir. 2021) (where plaintiff alleged her female harasser "interact[ed] with a male coworker in an inappropriately flirtatious manner," affirming summary judgment for employer and noting some conduct "was merely witnessed by [the plaintiff] rather than directed at her"); *Faragher*, 524 U.S. at 788 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (internal quotations and citations omitted)).

**Unreasonable Interference with Plaintiff's Work**: Finally, not only does Plaintiff fail to identify any evidence that the conduct interfered with her ability to work; the only evidence demonstrates the opposite. Plaintiff testified on multiple occasions that her injuries resulting from the *Colstar Accident* – not any purported workplace harassment – decreased her ability to interact with clients in-person and resulted in lost accounts. [DE 80-3, at 114-15, 120; DE 68-1, at 162]. Her performance declined in 2018. And in the twenty-two months between when she was hired (in February 2018) and her second medical leave (in November 2019), she was on medical leave for nearly eight months *because* she was unable to work as a result of the Colstar Accident. *Cf. Mitchell*, 189 Fed. App'x at 914 ("[N]o evidence exists that Overbey's behavior unreasonably interfered with Plaintiff's job performance. To the contrary, the evidence indicates that Plaintiff's health problems were the greatest hindrance to her job performance.").

C.     **Plaintiff ignores the cases cited in the district court's order that support summary judgment**

Numerous unpublished decisions[16] from this Court—which the district court cited but which Plaintiff fails to address—further support summary judgment for Defendants. [DE 172, at 15]. In *Mitchell*, 189 F. App'x at 913-14, for example, this Court found that "16 specific instances of offensive conduct" over four years "was

---

[16] Although not binding, unpublished decisions "may be cited as persuasive authority." 11th Cir. I.O.P. 7.

not that frequent," and not objectively severe or pervasive. *Id.* The plaintiff's supervisor touched or attempted to touch her "[o]nly three times": when he tried to kiss her at a Christmas party, when he lifted her over his head in the office, and when "rubbed up against her, whispered in her ear, and put his arm across her chest." *Id.* at 913 n.3. The other instances "involved 'offensive utterances,'" such as calling her a "frigid bitch" when she refused to kiss him, telling her she "look[ed] fine"; suggesting that she wear certain jeans and commenting that her "ass sure does look fine"; telling her she could "just walk into the room and [he would] get an erection"; asking her over her employer's telephones if she was dressed or naked; and telling her, at a work conference, "that the hotel had made a mistake and that they would have to share a room." *Id.*

And in *Latrece Lockett*, 315 Fed. App'x at 863, this Court affirmed summary judgment for the employer, finding the conduct was not sufficiently pervasive or severe where the plaintiff's coworker attempted to hug her, "touched her bottom quickly," "talk[ed] about sexual positions," made sexually explicit comments about her, stated "that she needed 'to get with a real guy,'" and "stuck out his tongue two or three times." After the plaintiff reported him, the coworker "admitted to everything," but called the plaintiff "a 'ho' and a 'bitch,'" and "divulged personal information about her sex life." *Id.*; *see also Guthrie*, 460 Fed. App'x at 804-07 ("a few dozen comments or actions . . . spread out over a period of eleven months," were

38

not frequent and, although alleged harassers "were rude and boorish in their statements and behavior" when they, *inter alia*, "grabbed" her "on her butt," "talked dirty" to her, "spoke openly about having sex" in a van, and made other comments, that "f[e]ll well short of conduct so severe as to 'alter or change the terms'" of her working conditions); *Jackson v. Ala. Dep't of Corr.*, 643 Fed. App'x 889, 892 (11th Cir. 2016) (conduct was not severe or pervasive where Plaintiff's superior "order[ed] her to sit near him after tightening his pants around his crotch," displaying "the outline of his genitals" on three or four occasions," twice stood "close enough behind her while she was sitting at the computer that she could feel his breath on the back of her neck," and told her "she looked good or smelled good" on roughly four occasions).

In sum, even when viewing the record in the light most favorable to Plaintiff, there is simply insufficient evidence to support a finding that a reasonable person would view the conduct as so severe or pervasive as to alter the terms and conditions of Plaintiff's employment. *See Gupta*, 212 F.3d at 583 (noting, even where there was "no doubt" the *plaintiff* "subjectively perceived the harassment to be severe and pervasive," the evidence did "not support a finding that from an *objective* viewpoint the alleged sexual harassment was so frequent, severe, or pervasive to constitute actionable sexual harassment" (italics added)). Thus, this Court should affirm.

## III.  THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT BECAUSE THERE IS NO BASIS FOR EMPLOYER LIABILITY

In *Vance v. Ball State University*, 570 U.S. 421, 424 (2013), the Supreme Court explained that an employer's liability for alleged sexual harassment "may depend on the status of the harasser."  If the harassing employee is the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions," meaning the Plaintiff must prove the employer "knew or reasonably should have known about the harassment but failed to take remedial action." *Id.*  If, on the other hand, the alleged harasser was a supervisor, the employer is not liable if it establishes, as an affirmative defense, (1) the employer exercised reasonable care to prevent and correct any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided.  *Id.*

Because, as discussed above, there is no evidence of conduct severe or pervasive enough to create a hostile work environment, this Court need not go any further.  But if it does, the Court should also affirm because the undisputed evidence establishes that Mr. Soto was not Plaintiff's supervisor, and there is no evidence to support a finding that Defendants were negligent with respect to any alleged misconduct.  Alternatively, Defendants cannot be held liable because, regardless of Mr. Soto's supervisor status, Defendants exercised reasonable care to prevent and

promptly correct any alleged harassment, but Plaintiff unreasonably failed to take advantage of those protective measures.

A. **Because Mr. Soto was not Plaintiff's supervisor, Plaintiff must present evidence that Defendants were negligent with respect to his conduct—but there is no evidence to support such a finding**

1. **Mr. Soto is not a supervisor**

The *Vance* Court expressly "reject[ed]" the contention that a supervisor is an individual who merely "exercise[s] significant direction over another's daily work," *id.* at 431, and held that more is required: a "supervisor" is someone "empowered by the employer to take tangible employment actions"—i.e., make "significant change[s] in employment status, such as hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"—against the plaintiff. *Id.* at 424. This rule is intended to be straightforward and "readily applied." *Id.* at 441. As the Supreme Court explained, "supervisor status will generally be capable of resolution at summary judgment." *Id.*

Summary judgment was appropriate here because, in addition to the fact that his conduct was neither severe nor pervasive, Mr. Soto was not a supervisor (and, as discussed below, there is no evidence Defendants were negligent).

Plaintiff refers to Mr. Roldan and Mr. Soto interchangeably and together, claiming both are supervisors without distinguishing between their roles, titles,

responsibilities, or authority.  IB at 30-32.  But Defendants never argued that Mr. Roldan was not Plaintiff's supervisor.[17]  [DE 67, at 13, 18-20; DE 172, at 17].

As for Mr. Soto, Plaintiff misstates the evidence.  Contrary to her claim that he had authority to "take or recommend disciplinary action against her," the evidence is undisputed that Mr. Soto "never had the authority to hire, promote, demote, reassign, suspend, or terminate" Plaintiff "[t]hroughout the entirety of [his] employment with Telemundo."  [DE 72, at 1; DE 80-2, at 18-19 (p.17-18)].

Plaintiff also wrongly asserts that Mr. Soto could "adjust[] her budget" or reassign accounts.  IB at 31.  Yet, both of those actions required involvement from the general manager.  [DE 80-2, at 18-21 (p.17-20)]; *see EEOC v. AutoZone, Inc.*, 692 Fed. App'x 280, 284 (6th Cir. 2017) (although alleged harasser "could initiate the disciplinary process and recommend demotion or promotion," his "ability to influence [the supervisor] d[id] not suffice to turn [him] into" a supervisor) (citing *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 272–73 (1st Cir. 2014) (human resources officer who advised the victim's actual supervisor was not a supervisor); *Spencer v. Schmidt Elec. Co.*, 576 Fed. App'x. 442, 447–48 (5th Cir. 2014) (per curiam) (foreman who bragged about his ability to influence

---

[17] Mr. Roldan's alleged conduct cannot support liability, either, because as discussed above, it was neither severe nor pervasive, and as discussed below, Defendants are shielded from liability from supervisor conduct under the *Faragher/Ellerth* affirmative defense.

employment actions but had to go up the ranks to do so was not a supervisor); *McCafferty v. Preiss Enters., Inc.*, 534 Fed.Appx. 726, 731 (10th Cir. 2013) (co-worker with potential to influence decisions was not supervisor when actual supervisor regularly visited the restaurant)).

In fact, although Plaintiff complained in her interview with Ms. Lewis that she subjectively believed Mr. Soto had transferred certain of her accounts, Ms. Lewis determined that Mr. Soto was not involved in those decisions. [DE 80-4, at 25, 94 (p.24, 93)]. And budgets were not, as Plaintiff suggests, arbitrarily set. Rather, the evidence is clear that they were based upon the "current billing" of each account executive and were usually "only adjusted at the end of" each year. [DE 80-2, at 28 (p.27)]. There was no evidence that Mr. Soto changed any employee's budget mid-year, and he testified that he did not recall ever doing so.

That Mr. Soto may have completed quarterly performance evaluations of the sales team does not transform him into a supervisor. Mr. Soto testified that he reviewed the sales team's progress each month, but there is no indication—and Plaintiff does not assert—that those evaluations had any tangible effect on her employment. [DE 80-2, at 25-26 (p.24-25)]. *See AutoZone*, 692 Fed. App'x at 284 ("And the ability to conduct performance evaluations does not turn Townsel into his victims' supervisor either.") (citing *Morrow v. Kroger Ltd. P'ship*, 681 Fed. App'x 377, 379-80 (5th Cir. 2017) (per curiam) (co-worker who filled out performance

evaluations and boasted about his ability to influence hiring and promotion decisions not a supervisor); *Matherne v. Ruba Mgmt.*, 624 Fed. App'x. 835, 840 (5th Cir. 2015) (per curiam) (manager who commented on performance and assigned responsibilities not a supervisor); *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004) (team leader who assigned tasks and conducted victim's performance evaluations not a supervisor)).

In sum, Plaintiff failed to identify any tangible employment action that Mr. Soto could take against her. And the evidence demonstrates the opposite. The Court should also affirm on this basis.

### 2. Plaintiff cannot show that Defendants were negligent

Because Mr. Soto was not Plaintiff's supervisor, to defeat summary judgment, Plaintiff was required to demonstrate a genuine dispute of fact as to whether Defendants "knew or reasonably should have known about the harassment but failed to take remedial action." *Vance*, 570 U.S. at 427. But there is no evidence to support such a finding.

It is undisputed that, for approximately fourteen months after she was hired, Plaintiff **never** reported the conduct—despite admitting that she received training and knew about the channels available to her. [DE 80-3, at 121-23, 149]; *cf. Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1553 (11th Cir. 1997) ("Where there exists an effective policy" that the employer has disseminated and shown a

commitment to following, "we conclude that the employer has made reasonably diligent efforts to learn and know of the conduct of its employees."). And Plaintiff does not—and cannot—argue that Defendants had constructive knowledge because there was no showing of pervasive harassment.

Immediately upon receipt of the April Letter—which Plaintiff admits was the first time she advised Defendants regarding the alleged conduct—Defendants conducted a thorough investigation—including interviewing Plaintiff and ***thirteen*** other employees—while Plaintiff was still on medical leave. Defendants were unable to substantiate her allegations of sexual harassment but regardless, once Plaintiff returned from her leave of absence, she only worked with Mr. Soto for a month before he was transferred to a new position. [DE 80-3, at 148; DE 80-2, at 14-16 (p.13-15)]. As discussed more completely in Section III.B., below, Defendants' investigation was reasonable under the circumstances, and Plaintiff's disagreement with the result does not evidence negligence on the part of Defendants.

**B.      Alternatively, regardless of supervisor status, there is no basis for employer liability under the affirmative defense established by *Faragher* and *Ellerth***

In *Faragher*, 524 U.S. at 775 and *Ellerth*, 524 U.S. at 742, the Supreme Court "wrote into the law" an affirmative defense that protects employers from liability for

an alleged hostile work environment[18] if the employer shows that it (1) exercised reasonable care to prevent and promptly correct sexual harassment; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities the employer provided. *Baldwin*, 480 F.3d at 1292, 1303.

Under the first prong, the promulgation and dissemination of an anti-harassment policy is often sufficient to prove that the employer took reasonable care to prevent harassment; then, once any alleged misconduct is reported, the employer must demonstrate that it exercised reasonable care to promptly correct it. "A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation." *Id.* It does not, however, require "a full-blown, due process, trial-type proceeding." *Id.* at 1303-04. Nor does it require "that the employer credit uncorroborated statements that the complainant makes if they are disputed by the alleged harasser" or put a "thumb on either side of the scale in a he-said, she-said situation." *Id.* "All that is required" is reasonableness under the circumstances. *Id.* Under the second prong of the defense, an employer will "normally" satisfy its burden by showing that the employee unreasonably failed to use the employer's complaint procedures. *Faragher*, 524 U.S. at 778.

---

[18] The defense does not apply where the employee suffered a tangible employment action, but Plaintiff does not contend she suffered any such action. *See supra*, n.11.

As shown below, both elements are conclusively established by the undisputed evidence. Thus, regardless of whether Plaintiff presented evidence to support a finding of a hostile work environment created by a supervisor (which she did not), as the district court correctly determined, there is no basis for employer liability.

### 1. Defendants exercised reasonable care to prevent and promptly correct any alleged sexual harassment

Defendants' Handbook contained a detailed anti-harassment policy with numerous channels for employees to report violations: in addition to reporting to HR or management, employees could anonymously report via toll-free hotlines in English or Spanish, an email address, or a webpage. *See id.*; *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir. 2000) (employer exercised reasonable care to prevent harassment by promulgating an effective anti-harassment policy). Plaintiff does not dispute the validity or adequacy of those procedures and admits that, despite her knowledge of those channels, she did not use them.

She instead focuses on Defendants' investigation. Plaintiff does not, however, contend that Defendants had any notice of the alleged harassment until fourteen months after she began work, in April 2019, when her counsel sent the demand letter. *See* IB at 43-44. She does not criticize the timeliness of Defendants' investigation—

which began that same month—and complains only about its thoroughness. But Plaintiff's grievances are not supported by the record or the law.[19]

Ms. Lewis did not, as plaintiff contends, "fail[]" to "follow up on many of the issues complained about." IB at 10-11. On the contrary, Ms. Lewis explained that she found the interviewees credible and felt that she had the necessary follow-up conversations for "a complete and thorough investigation." [DE 80-4, at 139 (p.138)]. Additionally, contrary to Plaintiff's assertion that Ms. Lewis demonstrated "bias in favor of her employer," because Ms. Lewis sought corroboration of Plaintiff's claims, this Court has recognized an employer's right to investigate—and seek to corroborate—accusations of harassment before acting. IB at 12; *see Baldwin*, 480 F.3d at 1303. And although Plaintiff claims that Ms. Lewis was "an employee of Defendants, and not a 'neutral party,'" she was an employee of an NBCUniversal subsidiary company **unrelated to Telemundo**, and there is no evidence she knew Plaintiff, Mr. Soto, Mr. Roldan, or any of the other employees she interviewed in connection with Plaintiff's allegations. [DE 80-4, at 20, 42, 124 (p.19, 41, 123)]. Plaintiff does not provide anything other than conclusory argument to challenge the integrity of the investigation.

---

[19] Within the Statement of Facts section of her Brief, Plaintiff presents improper, argumentative, and inaccurate statements regarding Ms. Lewis's investigation. *See* IB at 10-11.

In *Baldwin*, this Court rejected a similar argument where the plaintiff argued that an investigation was inadequate because, she asserted, the Human Resources department members "did not take more notes," their discussion was not "thorough" enough, and they did not give enough weight to the plaintiff's contention that one of the employee's answers "seemed rehearsed." *Id.* at 1304. This Court refused to "second guess investigations on grounds like those" and should reach a similar conclusion here. *Id.* The evidence—and this Court's precedent—establish that Ms. Lewis, on behalf of Defendants, performed a comprehensive workplace investigation by promptly interviewing thirteen witnesses to get to the bottom of Plaintiff's allegations notwithstanding that Plaintiff waited more than a year to report them. This was reasonable under the circumstances and conclusively establishes the first prong of the *Faragher/Ellerth* defense.

### 2. Plaintiff unreasonably failed to take advantage of any protective or corrective opportunities

Despite Plaintiff's knowledge of the policies and available reporting channels, it is undisputed she never used them. She asserts this was not unreasonable because, she claims, it was not until she was on leave that she "recognize[d] the full ramifications of the continuing discrimination." IB at 36. But even assuming there were evidence to support that claim, the law does not excuse Plaintiff's failure simply because she did not understand the "full ramifications" of the purported harassment. Moreover, although Plaintiff went on leave in October 2018, she did

not report the conduct for another six months, until April 2019. In fact, even though her counsel sent a letter to Defendants in December 2018, that letter contained ***no*** allegations of sexual harassment.

Plaintiff also claims, citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir. 2002), that an employee "cannot be found to have unreasonably failed to follow [a policy] when 'company practice indicates a tolerance towards harassment or discrimination.'" IB at 36. But in *Miller*, the employer learned about workplace harassment; in response, held a safety meeting to review anti-discrimination policies with its employees; but then did nothing to stop harassment that occurred after that meeting, so this Court held the employer could not avail itself of the *Faragher/Ellerth* defense. No such evidence of a "tolerance towards harassment" exists in this case. It shows only the opposite: Plaintiff could have reported the conduct through numerous channels, to several different people, or anonymously, but she never did; Defendants had no notice of the alleged misconduct until April 2019, when her counsel sent a letter; as soon as Defendants received that letter, they promptly investigated; and, after the letter (and her return from medical leave), Plaintiff worked with Mr. Soto for only one month before he was transferred to a new position.

Stated simply, Plaintiff contends this conduct went on for years—even before she or Mr. Soto worked at Telemundo, and even, she alleges, after Mr. Soto became

friends with her husband and was invited to her home.  Her failure to report the conduct for fourteen months after she was hired by Telemundo is unreasonable and inexplicable under the circumstances.  *Baldwin*, 480 F.3d at 1307 (finding plaintiff "waited too long" where her complaint was delayed more than three months) (citing *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1289-91 (11th Cir. 2003) (two-and-a-half-month delay in reporting was too long for purposes of *Faragher*)). Thus, as a matter of law, Defendants cannot be found liable.

## IV.  THE DISTRICT COURT CORRECTLY DENIED PLAINTIFF'S RULE 59 MOTION TO ALTER OR AMEND JUDGMENT

### A.  The district court properly denied Plaintiff's attempt to raise new arguments that should have been raised before entry of judgment

It is well settled that a Rule 59(e) motion cannot be used "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."  *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005).  Plaintiff concedes this point but argues the two witnesses that submitted declarations for the first time post-judgment were "unavailable" until they were served with trial subpoenas because they were "previously" subject to confidentiality agreements.  IB at 38.  Tacitly acknowledging she could have served them with deposition subpoenas before judgment was entered, she claims she did not do so "[i]n compliance with the Case Management and Scheduling Order."  IB at 38-39.

But nothing in that Order precluded Plaintiff from deposing witnesses she now contends were central to her case. [DE 22]. Even if she believed it did, however, she should have timely sought relief. Indeed, the district court's Case Management and Scheduling Order contemplates the limits imposed on discovery and depositions may be altered with "leave of Court." [DE 22, at 3]. Plaintiff had more than two years from the time she filed the initial complaint to the time the summary judgment order was entered; and she had nearly eight months between the motion for summary judgment and the district court's order to do *something* about obtaining this evidence, but failed to do so. She also failed to even notify the court—or Defendants—of the existence of those witnesses, and her belated claim that the court should have considered them anyway, even after the court entered judgment, defies logic and is unsupported by law.

Even if the declarations were to be considered, though, they do not change the result. Contrary to Plaintiff's argument, the district court did not render summary judgment for Defendants merely because "[t]here was no witness to the touching or more serious comments." *See* IB at 39. Indeed, Plaintiff uses that statement completely out of context: the district court did not reference that fact in connection with its analysis of the severity or pervasiveness of Mr. Soto's alleged harassment. Instead, the court merely observed Defendants could not be held negligent—"even if . . . the conduct was severe or pervasive enough,"—because there was no evidence

Defendants had notice of it. [DE 172, at 17-18]. In sum, the court properly refused to consider the untimely declarations but, even if it had considered them, they present nothing new and cannot create a disputed issue of fact.

## B. The trial court did not commit "manifest error"—or any error at all—when it dismissed Plaintiff's retaliation claim based upon her failure to cure the deficiencies it had previously identified

As Plaintiff recognizes, a "manifest error is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" IB at 40; *see Shuler v. Garrison*, 718 Fed. App'x 825, 828 (11th Cir. 2017). The district court clearly set forth the appropriate legal standard in its order dismissing plaintiff's claim. [DE 40, at 2-3]. Then, when Plaintiff sought relief from that order, [DE 41], the Court explained that, despite Plaintiff's failure to even file a response to the motion to dismiss, it "did not grant the Motion to Dismiss as unopposed" but "considered the merits" and "found that Plaintiff failed to cure the defects highlighted in the" first dismissal order. [DE 54, at 4].

Plaintiff does not identify any controlling precedent the district court disregarded or misapplied. As discussed in Section I, she cannot establish the district court committed any error at all, much less that it abused its discretion when it found no manifest error and refused to consider Plaintiff's efforts to "relitigate matters already decided." [DE 177, at 1]. Thus, this Court should affirm.

## V. PLAINTIFF DOES NOT HAVE DEMONSTRABLE FRONT OR BACK PAY DAMAGES

In the Motion for Summary Judgment, Defendants also argued Plaintiff failed to state a claim for front and back pay damages. [DE 67, at 24-25]. Plaintiff concedes the district court never reached the argument, but argues she nevertheless is entitled to such pay. IB at 36-38. Just as the district court did not evaluate this issue, this Court need not reach it: because summary judgment on liability was granted in Defendants' favor, the type of damages Plaintiff could have recovered, had she presented sufficient evidence in support of her claim, is moot.

To the extent the Court addresses the issue, her argument is in any event meritless. After the last day Plaintiff actually worked, November 12, 2019, she repeatedly declared under penalty of perjury that she could not work. She certified in her application for long term disability benefits that, on November 1, 2019, she "believe[d] her condition(s) became severe enough to keep [her] from working," and, as of the date of the application (July 31, 2020), she was "still unable to work because of [her] illnesses, injuries, or conditions." [DE 68-1, at 488, 491-92]. At her deposition, she similarly testified she had not performed any work since November 2019, she could not have performed her job duties as of November 2019, and she had not sought to return to work since her second medical leave [DE 80-3, at 44, 100, 153-54, 157]. Thus, whether Plaintiff "has always *intended* to return to

work" is irrelevant because the undisputed evidence shows that, as a result of injuries unrelated to the claims in this lawsuit, she could not do so.

Plaintiff's reliance on *Cush-Crawford v. Adchem Corp.*, 94 F. Supp. 2d 294, 296-96 (E.D.N.Y. 2000), is misplaced. There, after the plaintiff reported alleged sexual harassment, she "suffered an unrelated on-the-job injury, and never returned" to work. The case did not even reference a claim for back or front pay and, in fact, the jury awarded zero dollars in compensatory damages.

In sum, nothing supports Plaintiff's claims for these damages. Although the district court never addressed the issue, to the extent this Court does, it should affirm summary judgment for Defendants.

## <u>CONCLUSION</u>

Defendants respectfully request the Court to affirm dismissal of the retaliation

claim and summary judgment on the discrimination claim.

Respectfully submitted,

/s/ Jack R. Reiter
Jack R. Reiter, Esq.
Florida Bar No.: 0028304
jack.reiter@gray-robinson.com
Marlene Quintana, Esq.
Florida Bar No.: 88358
marlene.quintana@gray-robinson.com
Sacha Dyson, Esq.
Florida Bar No.: 509191
sacha.dyson@gray-robinson.com
Fabian A. Ruiz, Esq.
Florida Bar No.: 117928
Fabian.ruiz@gray-robinson.com
Sydney M. Feldman, Esq.
Florida Bar No. 1017798
sydney.feldman@gray-robinson.com
GrayRobinson, P.A.
333 SE Second Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7). This brief contains 12,932 words.

/s/ Jack R. Reiter

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Amended Response Brief was filed with the Clerk of Court using CM/ECF system this 16th day of June 2023. We also notify that the foregoing document is being served this day by Notice of Electronic Filing generated by CM/ECF on all counsel of record.

/s/ Jack R. Reiter